**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SHELIA ADAMS, ET AL. | § | |
| vs. | § | CIVIL ACTION NO. 2:09-CV-397 |
| PILGRIM'S PRIDE CORPORATION | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Fed. R. Civ. P. 52, the court makes these findings of fact and conclusions of law. Any finding of fact that is actually a conclusion of law should be treated as such. Any conclusion of law that is actually a finding of fact should be treated as such. The court makes all findings of fact after considering all of the admissible evidence.

## FINDINGS OF FACT

1.      Plaintiffs are former poultry growers for Pilgrim's Pride Corporation ("PPC"). Defendant, PPC, is a large integrated poultry company.

2.      Plaintiffs were poultry growers for PPC near PPC's El Dorado, Arkansas plant.  These growers are referred to herein as "El Dorado" growers or plaintiffs. Nearly all of the growers in this phase of the case grew broiler chickens for PPC.

3.      To become a poultry grower, one must either purchase an existing poultry farm, equipped with poultry houses, or construct the houses on an existing tract of land. Poultry houses are extremely expensive to construct and maintain. Depending on the number of houses a grower constructs, an expenditure could easily range from between $500,000 and $1 million. In general, lenders provided loans to growers to construct the houses after receiving some type of assurance from PPC (or its predecessor in interest) that a particular farmer would receive a contract for grower services.

4.      At various times, Plaintiffs entered into contracts to provide grower services with PPC. Plaintiffs' Ex. 54 is an example of such a contract.  Based on the credible testimony, the usual practice of a poultry integrator, including PPC, was to supply contracts for grower services only after a grower has purchased a farm or constructed poultry houses.  The contracts are essentially the same for all of the growers involved in this phase of the case.  Under the contracts, the growers grew chickens for PPC on a "flock-to-flock" basis.  The contracts provide: "[t]he term of this Agreement shall commence on the date of execution of this Agreement, continue on a flock-to-flock basis, and shall terminate upon completion of the engagement(s) subject to the right of the Company to terminate this Agreement upon written notice to the Independent Grower in the event the Independent Grower does not timely perform its obligations hereunder as provided in this Agreement."  P. Ex. 54 ¶ C.  The termination provision of the contracts additionally provides that "[e]ither the Independent Grower or the Company shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given after a flock is settled and before a new flock is placed."  P. Ex. 54 ¶ D.  Finally, the contracts provide that "[e]xcept for cause or economic necessity, Company will not terminate this Agreement without first requiring Independent Grower to follow the 'Cost Improvement Program' as described in Exhibit B."  P. Ex. 54 ¶ D.  PPC did not allow the El Dorado growers to negotiate the terms of their contracts.

5.      Under the contracts, PPC retained title to and ownership of the flocks at all times.  P. Ex. 54 ¶ F, 1.  Essentially, PPC would deliver young birds and feed to the plaintiffs, and the plaintiffs would raise the birds in the poultry houses constructed for that purpose.

6.      The El Dorado growers were paid pursuant to a tournament system whereby they were

ranked against other non-employee growers.  They received a base pay and, depending on how their farm performed in raising birds (i.e. feed consumption, etc.), the base pay would be adjusted relative to their score against other farms in the same tournament group.  The pay is based on how efficiently the growers convert feed into bird weight.  Employees of PPC also raised chickens for PPC.  The employees, however, were not ranked against independent growers in the tournament system.  The employee growers were paid separately.

7.      Generally, a bank will finance a loan for poultry houses for a term of at least 15 years.  P. Ex. 1032;  Dkt. No. 253, Tr. Transcript June 16, 2011 AM Session, at 48.  There is no feasible alternative use for the poultry houses other than to raise poultry and sell the grower's services to an integrator.  As a consequence, unless PPC or another integrator provided the grower with chickens to raise, the grower could easily be financially ruined.  Despite the flock-to-flock language in the written contracts, the growers and their lenders expected that the growers would be provided chickens to raise for at least the period it took to pay off any loans.  P. Ex. 1032.  By shifting the cost of constructing these facilities to growers, PPC reaped a substantial financial benefit because it did not have to build these facilities to raise its poultry.  Because of this dynamic, a grower without a buyer for its services is more economically vulnerable than an employee of an integrator.  The independent grower, unlike an employee who works for a poultry complex, has incurred the expense of constructing or purchasing physical facilities beneficial to only the integrator in exchange for compensation for grower services.

8.      Contracts for grower services in some markets other than El Dorado were for longer terms than the flock-to-flock contracts offered to the El Dorado growers.  Some were for seven (7) year terms. P. Ex. 222. (Nacogdoches/Lufkin complex agreement).  PPC gave extended contract periods

3

in the Nacogdoches/Lufkin complex because of pressure from lenders.

9.      PPC's predecessor in interest in the El Dorado complex was ConAgra Foods, Inc. ("ConAgra").  In 2003, PPC acquired ConAgra.  Many of the former ConAgra growers in this case began growing for PPC.  Others began growing for PPC after the acquisition.

10.     In December 2006, PPC acquired all of the outstanding common stock of Gold Kist, a competing poultry company, for $1.1 billion.  PPC financed the purchase almost entirely with debt. In the period leading up to the Gold Kist acquisition, PPC was profitable.  In 2005, PPC had a net income of $265 million, with earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $599 million.  The debt PPC incurred as a result of that acquisition, rising grain prices caused by an increased demand for ethanol, and a general downturn in the poultry market resulted in PPC's business becoming unprofitable.  PPC's net income in its fiscal year 2007 was approximately $51.5 million with EBITDA of $414.1 million over the same period.  By the end of fiscal year 2008, PPC had a net loss of approximately $998.6 million and negative EBITDA of approximately $820.9 million.

11.     On May 6, 2008, Clint Rivers ("Rivers"), then the President and CEO of PPC, wrote to the El Dorado growers and acknowledged the financial difficulties PPC was experiencing.  PPC was overextended in the commodity chicken market and was losing money in that market.  Among other things, Rivers told the growers "[w]e're also cutting production to balance supply and demand, which should lead to an increase in market pricing."

12.     PPC instituted some operational changes throughout 2008 in an effort to stem its financial losses.  At trial, these efforts were referred to as the "peanut butter cuts" because they were spread out over the company's operations as a whole.

13.     Bain & Company advised PPC concerning PPC's efforts to curb its financial losses.  PPC did not produce certain relevant documents from Bain until ordered to do so by the court.

14.     On October 22, 2008, Bain's "Project Alpha Business Plan" predicted that "[a]ssuming PPC's product mix, chicken prices could jump 30% over the next 12 months."  The Project Alpha Plan also noted "[i]n an effort to control costs and move prices up, the company closed 3 production facilities and 7 [Distribution Centers] and has taken down volume across the system."  P. Ex. 1029A. On November 18, 2008, Bain made a presentation to PPC that outlined a strategy to close certain plants to reshape the industry dynamic.  The purpose of the presentation was to impress upon PPC's management that it needed to take action to curtail the supply of chicken and apply a proactive stimulus to the market to raise prices.  Bain compared the present situation to the situation in other industries, such as the containerboard and aluminum industries.  Bain noted, for example, that when the containerboard industry closed 6% of its capacity in 1999-2000, prices jumped more than 40%.

15.     The 2008 efforts failed to return the company to profitability, however, and on December 1, 2008, in the Northern District of Texas, PPC filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

16.     PPC hired Don Jackson as its President and CEO on January 27, 2009, replacing the former CEO and COO.  Jackson worked with existing management to outline a business strategy to enhance financial performance.  Although PPC eventually relieved Bain of some of its advisory services, vestiges of the Bain plan remained in place after PPC hired Jackson and remained during PPC's reorganization efforts.  Bain employees continued to communicate with PPC employees concerning Bain's recommendations that idling certain plants would have a positive effect on pricing.  P. Ex. 1029T.  Both Lazard & Freres Co., in its FY 2009 Operating Budget, and Moelis & Company, in

5

a March 2009 presentation to the Unsecured Creditors Committee, stated that "[o]ne key objective of this plan is to remove commodity meat from the market and address ~5% oversupply." P. Exs. 1029K; 1029Q; D. Ex. 112. Phase II of the plan required idling of three facilities immediately. These facilities were located in Douglas, Georgia, Farmerville, Louisiana, and El Dorado, Arkansas. Douglas and El Dorado were both commodity chicken production plants. Farmerville was a prepared food plant. PPC's efforts to affect market price by sharply curtailing the supply of chicken were therefore not limited to Bain's presentations. Indeed, on February 11, 2009, Moelis employees, when discussing Phase II of the plan asked "Do we have buyers identified for the plants that are getting shut down? How do we mitigate the risk of competitors taking over the plants and not reducing overall supply of chicken on the market." P. Ex. 1412, at p. 3.

17.     On February 27, 2009, PPC sought authorization from the bankruptcy court to enter into an amendment to the Debtor In Possession ("DIP") Credit Agreement in connection with the debtors' determination to idle certain plants. PPC told the bankruptcy court that "[t]he idling of the Plants is intended to improve the Debtors' product mix and significantly reduce their costs in the midst of an industry-wide oversupply of chicken, weak consumer demand and a national recession." *In re Pilgrim's Pride Corporation*, No. 08-45664-dml11 Dkt. 987, at 4.

18.     The El Dorado growers filed objections to the idling motion. Among other objections, the growers maintained that "Pilgrim's CEO and spokesmen have stated that the true reason for idling the Plants–rather than selling them–is that they intend to raise the price of chicken that Pilgrim's produces at it [sic] other plants." *Id*. Dkt. 1208 at 4. A mediator facilitated the withdrawal of the objections and, on April 14, 2009, the bankruptcy court granted the motion, approving the idling of the El Dorado plant.

19.     As part of the mediated withdrawal of the El Dorado growers' objections, "The El Dorado Growers retain and do not waive any and all rights to bring claims against the Debtors and the Debtors reserve all rights and defenses to any additional claims that may be asserted by the El Dorado Growers, including that the payments hereunder may be applied as a credit against any such allowed claims."  *Id*., Dkt. 1470 at Ex. A, Term Sheet and Addendum Thereto.  In addition, a procedure was established to try to sell the Douglas and El Dorado facilities, with PPC retaining business judgment regarding the offers.[1]  Furthermore, among other things, PPC funded a pool to compensate the objecting El Dorado growers for the time period from May 9, 2009 through June 19, 2009.  The bankruptcy court's order allowing the idling of the plants approved and "incorporated herein by reference" the terms of the settlement.  *Id*., Dkt. 1470, at 3.  It appears to this court that these plaintiffs sought to preserve the very claims at issue in this case, and did so pursuant to the mediated withdrawal of the objections and the order approving the idling.  As this court reads the relevant portions of the bankruptcy court record, it appears that the parties agreed to allow the plants to be idled, while, at the same time, deferring the resolution of objectors' claims that the idling was motivated by an improper purpose.

20.     The evidence supports a finding that PPC's decision to idle El Dorado was motivated by a desire to manipulate the price of chicken.  For example, PPC announced its plans to idle the Douglas, El Dorado, and Farmerville complexes in late February.  In March, 2009, the Governor of Louisiana announced his effort to have a third party purchase the Farmerville plant.  Internally, PPC "talked about if these plants are somehow salvage [sic] by substantive offers, we'd look at other locations to replace these cuts."  P. Ex. 1029V.  PPC responded to the State of Louisiana's actions

---

[1]     PPC did not accept any offers to sell the El Dorado complex.

by threatening the closure of its complex in Natchitoches, Lousiana. P. Ex. 1029U-V. Unless PPC's overriding motive was to curtail supply to force prices to rise on the national chicken market, it should have made no difference to PPC that the Governor of Louisiana was attempting to broker the sale of one of PPC's unprofitable facilities.

21.     Furthermore, when the State of Louisiana offered to assist Foster Farms in its purchase of the Farmerville complex, William Snyder, PPC's Chief Restructuring Officer ("CRO"), stated the following:

> At the end of this email is an offer from Foster for the Farmerville facility. We know that the state of LA is covering $40 million of the deal so Foster's would be getting the plant for the working capital and would have NO basis in the PP&E. *Based on that I would not recommend it because it would enable them to flood the market with cheap chicken and foil our plans to restrict the chicken in the area and allow prices to rise.*

P. Ex. 1029R (emphasis added). The court rejects Mr. Snyder's explanations at trial for his choice of words in this email. The court accepts the email at face value for what it says about PPC's intent when it decided to idle Farmerville. Mr. Snyder also stated in an email that he had spoken to someone about making a commitment to reopen the Farmerville plant in two years if market conditions were right, and the State of Louisiana could assist growers in the interim. Mr. Snyder remarked "Cheaper for the State and gets past these issues and gets chicken off the market and we can stay with our plan." P. Ex. 1029S. The court infers PPC had the same intent in El Dorado.

22.     PPC expected that the idling of El Dorado would materially affect the national supply of commodity chicken and would result in an upward price adjustment. By idling the plant and not selling or leasing it, PPC sought to ensure, as it had in Farmerville, that a competing integrator could not, in Mr. Snyder's words, "flood the market with cheap chicken and foil our plans to restrict the chicken in the area and allow prices to rise."

23.     PPC's idling of the El Dorado plant was done for the purpose of manipulating or controlling the price of chicken.  Although PPC's plant idlings were unilateral conduct, PPC controlled nearly 25% of the national market for all chicken and roughly 50% of the national market for commodity chicken.  *See, e.g.*, Dkt. No. 283, Tr. Transcript July 11, 2011 AM Session, at 46-47.  Given the length of time it would have taken other competitors to replace capacity, PPC's actions were likely to lead to a competitive injury.  PPC thus violated Section 192(e) of the PSA.

24.     On September 15, 2009, certain growers entered a Settlement Agreement and Release ("Release") resolving certain claims.  The Release states it is governed by Texas law.  DTX 82 at ¶ 12.  The bankruptcy court approved the Release and dismissed certain claims by certain growers.

25.     Excepted from the Release are "those claims currently asserted in Adams et al. v. Pilgrim's Pride Corporation, Case No. 4:09-CV 387-Y (the 'Adams Case.')."  DTX 82 at ¶ 4.  Moreover, "nothing in [the Release] shall prevent the Growers from seeking to amend or amending their pleadings in order to replead the claims currently asserted in Plaintiffs' Original Complaint in the Adams Case...."  *Id*.

26.     The Original Complaint in the *Adams* case alleged that PPC violated Section 192(e) of the PSA by terminating the contracts of growers in the El Dorado and Farmerville Complexes prior to November 30, 2008.  The First Amended Complaint alleges that PPC violated Section 192(e) of the PSA by terminating the contracts of growers in the El Dorado and Farmerville Complexes, without regard to when those terminations occurred.  The PSA claims brought under Section 192(e) in this case arise from the idling of the El Dorado Complex and the concomitant termination of the growers' contracts.  The claims are therefore not barred by the Release.  This case is thus distinguishable from the Release considered by the bankruptcy court in *In re Pilgrim's Pride Corp*.,

453 B.R. 691 (N.D. Tex. 2011).

27.     PPC did not possess monopsony power in the market for grower services in the claimed El

Dorado market.  The relevant product market is poultry grower services.  The alleged geographic

market is a 40-mile radius around the El Dorado complex.  The plaintiffs' expert, Dr. Carter,

asserted there were no other integrators in that market.  The House of Raeford, however, is a

competing integrator within a 40 mile radius of the El Dorado complex.  Dkt. No. 294, Tr. Transcript

August 12 am, at 129-130.  Dr. Carter's conclusion as to monopsony power in El Dorado was wrong

because he put the House of Raeford complex in the wrong location.  *Id*. at 128.  When placed in

the correct location, there are multiple El Dorado growers who are available to grow for the House

of Raeford.  *Id*. at 131.  Plaintiffs have not proven that PPC had monopsony power in the market

they alleged.

28.     The evidence does not support a finding that PPC violated Section 192(a) of the PSA.  The

court is not persuaded that PPC committed any unfair or deceptive acts or practices beyond the

conduct done for the purpose of manipulating or controlling the price of chicken.

29.     The evidence does not support a finding that PPC violated Section 192(b) of the PSA.  The

court is not persuaded that plaintiffs have shown that any of the complained-of preferences have

been substantiated by credible evidence.  Although employee and non-employee growers were paid

based on different ranking systems, the court agrees with PPC that there were legitimate business

reasons for paying the growers through separate systems.  In addition, the court is not persuaded that

any preferences given to Bo Pilgrim adversely affected competition.  Likewise, the court is not

persuaded that any grower has established by credible evidence that PPC intentionally manipulated

the quality of chicks or feed delivered to their farms for retaliatory purposes or otherwise.  Finally,

the court rejects the suggestion that certain PPC employees had advance notice of the impending bankruptcy and were able to sell their farms before the bankruptcy was made public.  In particular, Chad Daniels and Tim Silmon sold their farms well before the bankruptcy filing–Daniels sold in July 2006 and Silmon sold in January 2007.  Dkt. 285, Tr. Transcript July 12, 2011 PM Session, at 112-113.

30.     The evidence does not support a finding that PPC violated the Arkansas Deceptive Trade Practices Act as to the El Dorado growers.  The court is not persuaded that these plaintiffs have shown that the conduct which violated the PSA necessarily violates the ADTPA.

31.     The evidence does not support a finding that PPC violated the Louisiana Unfair Trade Practices Act as to any of the El Dorado growers.  The court is not persuaded that these plaintiffs have shown that the conduct which violated the PSA necessarily violates the LUTPA.

32.     The evidence does not support a finding that PPC made any material false representations of fact as alleged by the El Dorado growers.  The court finds that the presentations made by Chad Daniels and others in an effort to cause the growers to upgrade their houses contained certain predictions, but did not contain actionable misrepresentations of fact.  In addition, the evidence does not support a finding that any such representations were made with the intent to deceive the growers.  The court credits the testimony that any poultry house upgrades were recommended in an effort to grow larger birds, in a more efficient environment.  As such, the court rejects the growers' fraud claims.

33.     Plaintiffs were injured as a result of the violation of the PSA.  Plaintiffs' damages model is flawed, however.  The damages model assumes that each plaintiff had a reasonable expectation of operating his or her poultry farm for more than 15 years after the date PPC idled the plants.  For

essentially the reasons set forth in this portion of his testimony, which the court found credible, the court agrees with PPC's expert that this approach overstates the growers' reasonable expectations. Many of the plaintiffs had been growing for many years before PPC even purchased ConAgra, and were at various stages in their farming careers.  PPC's expert stated that a more realistic prediction of the plaintiffs' damages horizon was between 0 and 6.25 years.  The court agrees with this view. Accordingly, the court will award the plaintiffs damages through 2015.  This period of time is supported by the appraisals of various farms, taking into account the risks inherent in the poultry business.  For those growers who produced tax information, the court has adopted the plaintiffs' damages model, but has awarded damages only through the year 2015.  The court has adopted the discount rate applied by the plaintiffs' damages expert.  For those certain growers who failed to provide their returns to the expert or otherwise failed to supply him with sufficient information for him to compute lost income, the court awards $ .60 per square foot through 2015.  Although the court finds that these plaintiffs suffered damages in fact, the court has had more difficulty estimating the amount of their damages with reasonable certainty.  These plaintiffs' failure to keep and produce records has caused the court to discount any award they might otherwise be entitled to.

34.     Gary Heath Agerton is entitled to $607,347.74.

35.     Jacob Wilson Agerton is entitled to $129,182.76.

36.     Jerry & Sandra Agerton are entitled to $737,087.69.

37.     Daniel and Brenda Albritton are entitled to $200,980.43.

38.     Dennis Andrews is entitled to $196,754.02.

39.     Tommy Barker, Jean Walters, and T&J Farms are entitled to $373,578.75.

40.     Jack  and Patti Baumgardner are entitled to $162,355.78.

41.    Evelyn Beard is entitled to $101,946.12.

42.    James David Bennett is entitled to $258,778.07.

43.    Tommy Bennett is entitled to $149,959.47.

44.    Curtis and Pam Boykin are entitled to $158,068.32.

45.    Coty Bradford is entitled to $515,159.12.

46.    Donald and Lavonne Brasher are entitled to $131,459.66.

47.    Walter Warner Brown is entitled to $107,596.59.

48.    Larry Bush is entitled to $198,119.04.

49.    Delea Bussell and Bussell Farms, Inc. are entitled to $349,983.33.

50.    Frederic Cauldwell is entitled to $196,754.02.

51.    Charles C. Carter is entitled to $90,236.53.

52.    John and Dana Carter are entitled to $148,087.29.

53.    Thomas and Becky Choate III and Grand Rogers Farm are entitled to $397,750.46.

54.    David Chrisman is entitled to $358,764.54.

55.    Christine Cole is entitled to $118,517.73.

56.    Sonja Dianne Cole is entitled to $441,462.75.

57.    Ralph Cole is entitled to $416,471.68.

58.    Melvin Daniels is entitled to $165,639.27.

59.    Clark Dean is entitled to $242,307.09.

60.    Griselda Dorman is entitled to $135,247.52.

61.    Richard Dale Elkins is entitled to $242,500.31.

62.    Morgan Farris is entitled to $488,553.07.

63.     Joe M. Ford o/b/o the Gloria Ford Estate is entitled to $106,556.06.

64.     Jeff and Penny Foster are entitled to $184,672.62.

65.     Ernest and Devayne Garris are entitled to $52,051.46.

66.     Stacy and Barbara Gates are entitled to $183,736.10.

67.     David Graham is entitled to $93,377.01.

68.     Based on the court's review of Robert and Dianne M. Gulley's tax returns from 2005-2008, the court computes past damages in the amount of $14,568.18.  P Ex. 549.  Future damages are awarded in the amount of $37,500.  The total award is $52,068.18.          .

69.     Johnny Hamaker is entitled to $301,044.69.

70.     William Rhett Hanry is entitled to $414,642.59.

71.     Pete Harrell is entitled to $119,021.56.

72.     Robert Heard is entitled to $212,797.48.

73.     Elmer and Leta Hearron are entitled to $173,822.53.

74.     David and Rhonda Hunt are entitled to $249,456.35.

75.     Kevin and Kaye Hux and Hux Farm LLC are entitled to $302,074.42.

76.     Denise Jackson is entitled to $311,546.27.

77.     Mike and Connie Jerry are entitled to $524,405.11.

78.     Thomas and Vivian Jerry are entitled to $249,888.49.

79.     Robert A. Jiles is entitled to $119,511.15.

80.     Edward and Mona Johnson are entitled to $320,686.93.  The court has reduced what would have been a total award of $971,778.57 by two-thirds to account for the fact that they lost four of their poultry houses in a fire and the loss of these houses would impair their ability to operate their

business at the levels they did prior to PPC's idling of the El Dorado facility.

81.     Jean and Gary Kenly are entitled to $9,762.99.

82.     James and Sally Knight are entitled to $152,347.34.

83.     Delton and Jerry Langley are entitled to $179,587.89.

84.     Terry Laster is entitled to $703,136.55.

85.     Tim Loftin and Timkle Farms, Inc. are entitled to $411,018.35.

86.     Will Martin is entitled to $233,215.00.

87.     Dennis and Marsha Martindale are entitled to $159,760.33.

88.     Jackie and Joyce Martindale are entitled to $38,367.85.

89.     James O. and Daphne McDougle are entitled to $150,761.08.

90.     Johnny Mooney is entitled to $454,050.98.

91.     Steven Moore and Moore Farms, Inc. are entitled to $353,802.09.

92.     Timothy and Angelina Murphy are entitled to $350,636.10.

93.     Paul Odom is entitled to $324,550.97.

94.     Bobbie Orr is entitled to $97,393.24.

95.     Jeffery and Tammy Orr are entitled to $23,962.29.

96.     Randall and Carolyn Pagan are entitled to $377,291.76.

97.     Ryan and Lanella Peek are entitled to $799,129.33.

98.     William Lloyd Phelps is entitled to $713,763.83.

99.     Bob and Dorothy Poole are entitled to $844,275.64.

100.    Robert and Mary Poole are entitled to $611,322.42.

101.    Barry Pratt is entitled to $121,718.85.

102.    Russell Pratt is entitled to $203,937.04.

103.    Pat and Gloria Risinger are entitled to $360,508.77.

104.    Liandro and Juana Ruiz are entitled to $100,165.33.

105.    Roberto and Danah Ruiz are entitled to $487,370.22.

106     Bobby Smith is entitled to $342,576.87.

107.    Paul J. Smith is entitled to $91,318.84.

108.    Tim and Laura Smith and Shows and Smith LLC are entitled to $441,700.36.

109.    Frank Stevenson Jr. is entitled to $210,697.76.

110.    John M. Sutterfield is entitled to $864,967.49.

111.    Tony and Joyce Taylor and Double T Farms are entitled to $222,381.61.

112.    Rex Thurlkill is entitled to $265,253.66.

113.    Todd and Leah Thurlkill are entitled to $154,971.53.

114.    Raymond Merle Tucker is entitled to $43,479.14.

115.    Glenn E. Walters is entitled to $277,373.19.

116.    Alan Mark Ware is entitled to $210,444.15.

117.    Larry and Jacqueline Washam are entitled to $196,754.02.

118.    Perry and Aleta C. Watkins are entitled to $548,478.37.

119.    Patricia Webb is entitled to $339,836.06.

120.    Roy and Nelda Williams are entitled to $38,858.93.  This amount reflects the poultry-related

income the Williamses derived from PPC in 2006 and 2007 and excludes income from the sale of

cattle.  *See* P Ex. 0601-0091; 0601-0129; *see also* Dkt. No. 298,  Tr. Transcript August 11 pm, at

129-131.

16

121.    David W. Wilson is entitled to $362,166.83.

122.    Patricia Wilson is entitled to $239,036.66.

123.    Casey Wooten is entitled to $513,467.11.

124.    Larry O'Neil Wooten is entitled to $393,500.32.

## CONCLUSIONS OF LAW

1.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1334. All parties consented to trial before the undersigned Magistrate Judge.

2.      This court has personal jurisdiction over the defendant, and venue is proper in this court pursuant to 28 U.S.C. § 1391.

3.      The PSA makes it unlawful for a "live poultry dealer" to

>   (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
>
>   (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or
>   . . .
>   (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce. . . .

7 U.S.C. § 192.

4.      PPC is a live poultry dealer under the PSA.

5.      Enacted in 1921, the PSA's primary purpose is "to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry" and "to safeguard farmers . . . against receiving less than the true market value of their livestock." H.R. Rep. No. 85-1048, at 1 (1957), reprinted in 1958 U.S.C.C.A.N. 5212, 5213. The "chief evil" Congress sought to guard

against was the monopolistic practices of the packers, "enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Been v. O.K. Industries, Inc.*, 495 F.3d 1217 (10th Cir. 2007) (quoting *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922)).  The PSA is a remedial statute, and it is "to be construed liberally in accord with its purpose to prevent economic harm to producers and consumers at the expense of middlemen." *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).

6.    Under the PSA, a plaintiff is required to prove that the challenged practice will likely lead to a competitive injury.  *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355 (5th Cir. 2009) (en banc).

7.    PPC violated Section 192(e) of the PSA by idling the El Dorado plant and curtailing the supply of chicken for the purpose or with the effect of manipulating or controlling prices.

8.    Although PPC's conduct was unilateral conduct, the conduct threatened to cause anticompetitive effects because of the volume of chicken PPC could control on the national market. By idling the El Dorado plant (as opposed to selling it), and refusing to purchase from the growers for an indefinite period of time, PPC adversely impacted the growers in a manner actionable under the PSA.  7 U.S.C. § 192(e).

9.    Texas law construes releases like contracts. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990).  The court's primary concern is to ascertain the true intentions of the parties as expressed in the instrument.  *Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983).  The language of the release is given its plain grammatical meaning unless that would defeat the intent of the parties.  *DeWitt Cnty. Elec. Coop. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).  The court considers the release in light of its surrounding circumstances, and even when certain claims exist when the release is signed, claims not clearly within the subject matter of the release are not discharged.  *Victoria Bank & Trust Co.*

18

*v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991).  Considering the circumstances in which the release was executed, along with its language excepting the pending claims in this case, the court is not persuaded that PPC has shown that the Section 192(e) claim is within the scope of the release.  The court concludes that the parties did not intend to release the Section 192(e) claims.

10.    PPC did not violate Section 192(a) of the PSA.

11.    PPC did not violate Section 192(b) of the PSA.

12.    PPC did not violate the Arkansas Deceptive Trade Practices Act.

13.    PPC did not violate the Louisiana Deceptive Trade Practices Act.

14.    PPC is liable to the plaintiff growers in the amounts set forth in the court's findings of fact.

15.    The growers' claims are not barred by the law of the case doctrine.  Although the court has fully considered Judge Lynn's thoughtful opinions, none of these growers' claims has previously been litigated, and although the claims arise out of the same bankruptcy case, the claims before the court arise from a separate adversary proceeding.  Moreover, the court was presented in this case with a different record from the record before Judge Lynn when he awarded PPC summary judgment on other growers' claims.

16.    Judgment has been rendered accordingly pursuant to Rule 54(b).  Any attorneys' fees motion shall be made at the conclusion of all of the phases of this case.

        SIGNED this 30th day of September, 2011.


                                    _____
                                    CHARLES EVERINGHAM IV
                                    UNITED STATES MAGISTRATE JUDGE