IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SHEILA ADAMS, ET AL. | § § | |
| v. | § § | Case No. 2:09-CV-397-RSP |
| PILGRIM'S PRIDE CORPORATION | § § | |

**MEMORANDUM RULING**

Currently before the Court is the Motion for Summary Judgment (Dkt. No. 159) filed by Defendant Pilgrim's Pride Corporation on April 15, 2011. The Motion comes back before the Court to consider the effect of the August 27, 2013 decision of the Court of Appeals (the *Agerton* decision) reversing the Judgment rendered in favor of some of the Plaintiffs ("the El Dorado growers") on September 30, 2011. For the reasons expressed below, the Court finds that the *Agerton* decision applies with equal force to the claims of all of the Plaintiffs.

*Background*

Defendant Pilgrim's Pride Corporation ("PPC") is one of the largest producers of processed chicken. PPC operates a network of chicken processing facilities throughout the Southeast United States. These processing facilities are supplied with chicken by poultry growers who raise the chickens on their own farms and sell them to PPC pursuant to Poultry Grower Agreements. The Plaintiffs are more than 200 poultry growers, most of whom were selling their chickens to two PPC processing facilities that were closed or idled by PPC in early 2009. Plaintiffs allege that the closure of these processing facilities was in violation of the Packers and Stockyards Act of 1921, ("PSA"), 7 U.S.C. §192(e).

The closed processing facilities were in El Dorado, Arkansas and Farmerville, Louisiana. There are also growers in Nacogdoches, Texas, and DeQueen, Arkansas (actually the Nashville,

1

Hope and Batesville facilities collectively) who complain of certain discriminatory practices alleged to be in violation of the PSA. The first bench trial involved the roughly 90 poultry growers surrounding the El Dorado processing facility. The 2011 Judgment and the *Agerton* appeal involved those growers. The trial of the more than 40 growers in the Farmerville complex had been largely completed at the time the *Agerton* decision was rendered.

In the *Agerton* decision the Fifth Circuit summarized the record as follows:

> Facing severe economic difficulties in 2008, PPC ceased profitability and began losing substantial amounts of money. The primary reason for PPC's mounting financial problems appeared to be the company's over-extension into the commodity chicken market, of which PPC held an estimated 50% market share. When PPC evaluated its operations, it concluded that it was unnecessarily producing a surplus of commodity chicken at great cost to itself. In an effort to stem its losses and streamline operations, PPC closed or idled several processing and distribution facilities, divested assets, restructured supply contracts, and laid off a number of employees. However, these measures proved ineffective and PPC ultimately filed for Chapter 11 bankruptcy relief in December 2008.

*Agerton v. Pilgrim's Pride Corp.*, 728 F.3d 457, 459 (5th Cir. 2013). With the approval of the Bankruptcy Court, PPC moved forward with a plan to close some of their processing facilities in 2009. In its findings of fact after the El Dorado growers' trial, this Court found that " PPC's overriding motive was to curtail supply to force prices to rise on the national chicken market." (Dkt. No. 321 at 8). The Court also found although PPC's conduct was unilateral, it was done "for the purpose of manipulating or controlling the price of chicken," and was "likely to lead to a competitive injury" because of PPC's substantial national market share. *Id*. at 9. The Court rejected the claims under §§192(a) and (b) of the PSA, as well as the claims under the Arkansas and Louisiana Deceptive Trade Practices Acts. Judgment was rendered in favor of each grower for lost profits through 2015.

The Court of Appeals held that §192(e) of the PSA "proscribes only anti-competitive conduct" and that, in the context of the PSA, is conduct that is "likely to suppress or destroy

2

competition" under a "rule of reason" analysis. *Agerton,* 728 F.3d at 462. The Court noted that "healthy competition depends on individual firms aggressively pursuing their own interests" and stated that it was "particularly hesitant to condemn the unilateral act of a single firm." It characterized PPC's conduct as "wisely decid[ing] to stop flooding the market with unprofitable chicken." The Court concluded by holding:

> PPC's conduct was merely the legitimate response of a rational market participant to changes in a dynamic market. If a firm inadvertently over-produces a good and drives down prices, it does not break the law by cutting production so that prices may recover. We therefore hold that PPC did not violate PSA § 192(e) by reducing its commodity chicken output.

*Id.* at 462-63.

At the time of the trial of the Farmerville growers, before the *Agerton* decision, Plaintiffs contended that there was no material difference in the liability case presented by the El Dorado and Farmerville growers. *See, e.g*. Dkt. No. 365 at 6, 13-14; Dkt. No. 372. In their current briefing, Plaintiffs contend that the evidence presented on behalf of the Farmerville growers satisfies the standards set forth in *Agerton* in the following ways:

(a) PPC's plan was to keep as much chicken off the market as possible, whether or not it was their own product, in order to increase prices;

(b) PPC officials lied to the public by saying PPC was just trying to save cost by closing underperforming plants;

(c) PPC threatened Louisiana Governor Bobby Jindal that PPC would close its Natchitoches processing plant if the Governor forced PPC to sell the Farmerville facility instead of just closing it;

(d) PPC was trying to increase the market price rather than just its own "internal pricing;"

3

(e) PPC committed the "unnatural" act of killing pullet flocks to stop production;

(f) a manager of House of Raeford (a competitor of PPC) told some growers that it would not accept their birds at its facility unless the growers got a release from PPC;

(g) even though the Court determined that PPC lacked monopsony power in El Dorado, PPC had such power in Farmerville.

With respect to issues (a) through (e), above, the Court finds that they are all facts which, even if established, would not result in a violation of §192(e) of the PSA under the analysis provided by *Agerton*. With respect to issue (f), the Court finds that no credible evidence was produced that PPC caused anyone with House of Raeford to make such statements, and no plaintiffs established that they were injured thereby. Finally, with respect to issue (g), Defendant argues persuasively that PPC had even less opportunity at monopsony power in Farmerville, where the plant was sold to Foster Farms, and where House of Raeford was clearly competing nearby, than it did in El Dorado. There is no persuasive evidence of monopsony power.

Plaintiffs also assert a claim under the Louisiana Unfair Trade Practices Act ("LUPTA'), La. R.S. 51:1405. To succeed on a LUTPA claim, a plaintiff must show that the defendant engaged in conduct that "offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.,* 35 S.3d 1053, 1059 (La. 2010). What constitutes an unfair trade violation is determined on a case-by-case basis. *Id*. "The range of prohibited practices under LUTPA is extremely narrow," however, and there is "a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Cargill, Inc. v. Degesch Am., Inc*., 875 F.Supp.2d 667, 676–77 (E.D.La.2012) (citing *Turner v. Purina Mills, Inc*., 989 F.2d 1419, 1422 (5th Cir.1993)). LUTPA does not provide an alternate remedy for a breach of contract claim.

*Turner,* 989 F.2d at 1422. Indeed, "only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA," *Cheramie Servs.*, 35 So.3d at 1060, and this "egregiousness" often involves "the breach of a special relationship of trust." *Cargill*, 875 F.Supp.2d at 677.

Defendant argues that Plaintiffs lack standing to pursue claims under LUPTA because plaintiffs are neither consumers nor business competitors of PPC. Although the Fifth Circuit previously limited LUTPA's private right of action to individual consumers or business competitors, *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc*., 922 F.2d 220, 226 (5th Cir.1991), the Louisiana Supreme Court has since indicated that LUTPA includes no such limitation. *Cheramie Servs*., 35 So.3d at 1057 ("LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss.... Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members."). There is a split of authority as to whether the plurality opinion in *Cheramie* settles the issue. *Compare, Baba Lodging, L.L.C. v. Wyndham Worldwide Operations, Inc*., 2011 WL 1598910 (W.D. La. 2011) (no standing) and *Swoboda v. Manders*, 2015 WL 8493988 (M.D. La. 2015) (no standing), *with Nola Fine Art, Inc. v. Ducks Unlimited, Inc*., 86 F.Supp.3d 602 (E.D. La. 2015) (standing). For purposes of this ruling, the Court will assume that Plaintiffs have standing under LUPTA.

The heart of the Plaintiffs' unfair trade practices claims is that they were encouraged by PPC to make long-term investments in their farms, building and equipping expensive chicken houses, with the belief that they would have a long-term market for their chickens. Then PPC shut down the processing facilities and left them without a viable market alternative. The evidence clearly shows that PPC made a calculated decision to shut the facilities, knowing it

5

would leave the Plaintiffs without a market. Indeed, PPC intended the Plaintiffs to be without a market because that was the only way the supply of chicken would be reduced and the price, assuming constant demand, would be increased. However, the Fifth Circuit found this to be lawful:

> Even if PPC hoped that chicken prices would respond to the output reduction by settling at a higher equilibrium price, that would not alter our conclusion. Far from being a nefarious goal, higher prices are the natural consequence of a reduction in supply. If it is lawful for a business to independently control its own output, then it is also lawful for the business to hope for the natural consequences of its action.

*Agerton,* 728 F.3d at 462-63. The evidence is also clear that PPC did not encourage the Plaintiffs to make these investments intending to cause the Plaintiffs' losses. PPC was building a reliable supply for its processing facilities. It was only when PPC ran into financial difficulties, whether caused by extrinsic market forces (such as the increased cost of chicken feed or the decreased demand brought on by the recession) or by bad investments and imprudent acquisitions, that PPC decided to try to improve its bottom line by closing some of its processing facilities. The evidence supports that PPC had twin goals: reducing operating costs and raising the price of chicken by reducing the supply of processed chicken. Nothing in the evidence meets the high standard of "egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct" required for a violation of LUPTA.

Similarly, the discriminatory practices that Plaintiffs complain of for the Nacogdoches and DeQueen growers fail the test for unfair trade practices. Requiring the growers to upgrade their chicken houses from conventional to the more expensive cool cell technology, even if not all growers are required to do so at the same time, has not been shown by Plaintiffs to be an illegal practice. Nor is the fact that some growers received 7-year contracts and some were only offered flock-to- flock contracts. Nor is the fact that employees may receive more preferential

6

treatment as growers than non-employee growers.  Plaintiffs' arguments about these practices were primarily based on the PSA (Dkt. No. 58), but they were rejected by this Court and not overturned by the Court of Appeals.  Plaintiffs have been given an opportunity to offer additional arguments in support of these claims but have not done so.   Plaintiffs have also failed to present any credible evidence of actionable fraud by PPC.

With respect to the claims of the Farmerville Plaintiffs, the Court relies upon the record adduced at the bench trial already conducted.  With respect to the remaining Plaintiffs, the Court relies upon the previously filed Motion for Summary Judgment, reconsidered in light of the ruling of the Court of Appeals in *Agerton*.  That motion will be granted and all claims will be dismissed.

**SIGNED this 22nd day of April, 2016.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE